# In the United States Court of Federal Claims

No. 08-417C

(Filed: May 11, 2009)

```
*********************************
                                  )   Certification of a claim under the
DICK PACIFIC/GHEMM, JV,            )   Contract Disputes Act, 41 U.S.C.
on behalf of W.A. Botting Company, )   § 605; whether recertification is
                                  )   needed for a claim that is presented
        Plaintiffs,               )   to a contracting officer for a second
                                  )   time by agreement of the parties;
        v.                        )   interpretation of a contractual clause
                                  )   providing for economic price
UNITED STATES,                    )   adjustment of actual labor costs; FAR
                                  )   §§ 16.203-1(a), 16.203-4(c), 52.216-4;
        Defendant.                )   disputed issues of material fact
                                  )
*********************************
```

Robert H. Crick, Jr., Robert Crick Law Firm, PLLC, Spokane, WA, for plaintiff.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the brief were Michael F. Hertz, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

This contract case stems from work performed by a contractor, Dick Pacific/GHEMM, JV ("Dick Pacific") and one of its subcontractors, W.A. Botting Company ("Botting") in constructing the Bassett Hospital replacement at Fort Washington, Alaska. The crux of the dispute concerns a price-adjustment clause in the contract. The government has moved to dismiss plaintiff's price-adjustment claim for lack of subject matter jurisdiction, and the parties also have filed competing cross-motions for summary judgment. The issues on the merits are

first, whether the government breached a settlement agreement entered in 2007 in a previously filed case in this court involving the same claim, and second, whether the contract requires the government to pay increased labor costs that Botting incurred when acting as a subcontractor to Dick Pacific. Compl. ¶¶ 24, 27, 28, 31. Dick Pacific's motion for partial summary judgment addresses only the issue of whether Dick Pacific and Botting are entitled to receive a price adjustment that would cover their increases in actual labor costs and related expenses. Pl.'s Am. Mem. in Supp. of Mot. for Partial Summary Judgment at 13-14 ("Pl.'s Am. Mot."). Contrastingly, the government puts forward a double-barreled response. It contends that the court lacks jurisdiction to adjudicate plaintiff's economic-price-adjustment claim because Dick Pacific failed to recertify its claim to the contracting officer when that claim was again presented to the officer subsequent to entry of the settlement agreement in 2007, even though Dick Pacific had submitted a properly certified claim as an original matter. Def.'s Mot. to Dismiss or, in the Alternative, Cross-Mot. for Summary Judgment and Resp. to Pl.'s Mot. for Partial Summary Judgment at 11-12 ("Def.'s Cross-Mot."). Separately, on the merits, the government avers that Dick Pacific cannot demonstrate that the government breached the 2007 settlement agreement and that the terms of the price-adjustment clause in the contract bar any relief. *Id*. at 12, 18. The competing motions have been fully briefed and a hearing was held on April 17, 2009.

## FACTS[1]

The government's initial solicitation of bids for the Bassett Hospital replacement project was canceled because the government determined that the bids it received were prohibitive in cost. *See* Pl.'s App., Ex. 1 (Decl. of Pete Botting, President of W.A. Botting Co. (Oct. 15, 2008)) ("Botting Decl.") at 2.[2] The government resolicited bids for the project in October 2001, proposing, among other things, to add an economic-price-adjustment clause to address the risk that labor costs would increase during the course of the large project. *See* Botting Decl. at 2. On February 19, 2002, the government informed Dick Pacific that it had been awarded the contract at a fixed price of $178,289,000. Pl.'s App. at 17 (Award of Contract (Feb. 19, 2002)). The government issued the "contract notice to proceed" to Dick Pacific on March 14, 2002. Compl. ¶ 8. The Bassett Hospital replacement project was substantially completed four and one-half years later, on October 2, 2006. *Id*.

The second solicitation expressly incorporated an economic-price-adjustment clause into the contract, drawn virtually verbatim from the economic-price-adjustment clause set out in the Federal Acquisition Regulations ("FAR") at 48 C.F.R. § 52.216-4. *See, e.g.*, Botting Decl. at 2; Pl.'s App. at 13-14 (Contract Section 52.216-4). That provision of the FAR addresses

---

[1]The recitations that follow do not constitute findings of fact by the court. Instead, the recitals are taken from the parties' filings and either are undisputed or alleged and assumed to be true for purposes of the pending motions, except where a factual controversy is explicitly noted.

[2]Both plaintiff's and defendant's appendices of exhibits are paginated sequentially and consecutively, and citations to those exhibits will follow the parties' pagination.

adjustments for increases or decreases in actual costs of labor and materials; the slight modification of FAR § 52.216-4 in the solicitation deleted the words that would have allowed a contractor to receive price adjustments for materials. *Compare* Pl.'s App. at 13 (Contract Section 52.216-4 as modified), *with* FAR § 52.216-4. The resulting economic-price-adjustment clause provided that "[a]ny adjustment shall be limited to the effect on unit prices of the increases or decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) [c]hanges in rates or unit prices other than those shown in the Schedule, or (ii) [c]hanges in the quantities of labor of those established in the baseline pre-award audit." Pl.'s App. at 13 (Contract Section 52.216-4 as modified from FAR § 52.216-4).

In addition to the economic-price-adjustment clause, the government included a proposed schedule with the solicitation documents. Pl.'s App. at 18-20 (Proposal Schedule). The proposed schedule identified the work a contractor would have to perform under the contract by item number. *Id*. at 18. The construction of the replacement hospital and the site work were covered by base line items 0001 and 0002. *Id*. at 18. The proposed schedule provided that those line items were "subject to clause 52.216-4, Economic Price Adjustment-Labor and Materials." *Id*. at 19. However, that proposed schedule went on to provide that "Davis-Bacon General Decision Number AK010001 and AK010006, dated 10/19/01 in section 0700A are subject to [a]djustment." *Id*. Ordinarily, Davis-Bacon labor rates would be treated as a price-index base for adjustments of labor rates, covered under a different portion of the FAR than the actual-rate adjustment provision that was inserted into the solicitation. The proposed schedule concluded with a specification that "[g]overnment-evaluated EPA adjustments will be reflected as sub-line item under 0011 after contract award." *Id*. The proposed schedule thus introduced an ambiguity into the solicitation.

On October 31, 2001, the government held a pre-proposal conference. Botting Decl. at 3. The participants at the meeting were informed that if "[a]nything . . . comes out of this meeting we will address [it] in [an] amendment that's going to be coming out in mid-November." Pl.'s App. at 24 (Transcript of Pre-Proposal Conference (Oct. 31, 2001)). At the conference, the program manager explained that the economic-price-adjustment clause was inserted into the solicitation in an effort "to allow contractors to bid competitively for labor rates initially, with the understanding that if rates increase in the future, that [t]he[y] will have a mechanism for getting additional funds to cover those increases in labor costs." *Id*. at 26 (Transcript of Pre-Proposal Conference). Subsequently on November 21, 2001, the government issued Amendment 0001 to the solicitation, which provided that:

> A. Prior to the award of the contract, the successful offeror shall be prepared to furnish cost information to assist DCAA (Defense Contract Audit Agency) for establishment of a baseline quantity of labor for future economic price adjustments. The following information may be requested from any offeror prior to contract award:

> 1. *Direct Labor Rates*:
>
> a. *If Davis Bacon wage determination is used*, identify rate categories used (e.g., operator 1, operator, etc.)
> b. *If union rates are used*, provide the latest negotiated union agreement
> c. *If labor rates are based on current employees*, provide copies of latest payroll records
> d. Provide breakdown of burdened labor rates (e.g., FICA, FUTA, Alaska Unemployment, Worker's Comp., etc.)
> e. Provide copies of Worker's Comp. Insurance policy, General Liability Insurance policy (if applicable), and Alaska ESC rate.

Pl.'s App. at 29 (Amendment 0001, Excerpts) (emphasis added).[3]

      Accordingly, under the terms of Amendment 0001, the Defense Contract Audit Agency ("DCAA") was implicitly given the task of conducting a pre-award audit of baseline labor. *See* Pl.'s App. at 29 (Amendment 0001, Excerpts). After Dick Pacific was awarded the contract for the hospital replacement and before work commenced on the project, DCAA initiated its audit of Dick Pacific's labor costs. Pl.'s App. at 217 (Letter from Dick Pacific to Daniel Werkmeister, Department of the Army (Mar. 4, 2002)). To complete the audit prior to the start of performance, the government's auditors requested a sixty-day delay of the contract's start date. Pl.'s App. at 299 (Dep. of Ken Larson, Ex. 1 (Draft Information/Point Paper)). Dick Pacific had not yet completed all of its agreements with subcontractors, including an agreement with Botting, and thus it could provide only some of the information that the government sought. *See* Pl.'s App. at 217 (Letter from Dick Pacific to Werkmeister). However, because of the relatively short construction season in Fairbanks, Alaska, where Fort Washington is located, the auditor's request for a 60-day delay was "not acceptable to the contractor, our customer[,] or the program manager." *See id.* Consequently the audit was not completed prior to March 14, 2002, when Dick Pacific received notice to proceed from the government. *See id.*; Compl. ¶ 8.

      Upon learning of Dick Pacific's efforts to secure the Bassett Hospital replacement contract, Botting submitted bids to work as a subcontractor for Dick Pacific on the project. Botting Decl. at 2. After being informed that it had been awarded the contract, Dick Pacific determined that Botting would serve as the subcontractor for the mechanical portion of the project, and on May 16, 2002, Dick Pacific and Botting entered into a subcontracting agreement. Def.'s App. at 80-85 (Excerpts from Dick Pacific Subcontract Agreements with Botting (May 16, 2002)); *see also* Botting Decl. at 2.

---

[3]The parties dispute whether Amendment 0001 is part of Dick Pacific's contract with the government resulting from the solicitation. *See* Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact at 7.

Botting was a signatory to an agreement between the Mechanical Contractors of Fairbanks and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Local Union 375. *See* Pl.'s App. at 35 (1997-2002 Plumbers and Pipefitters Labor Agreement). That union agreement took effect on July 1, 1997 and extended through June 30, 2002. *Id*. at 47. Under the terms of the agreement, Botting was required to pay union wage rates. *Id*. at 36-37.

During the second year of contract performance, Botting informed Dick Pacific that it would be required to pay the plumbers and steamfitters working on the Bassett Hospital replacement an additional $2.15 hour, which would result in a cost increase of $430,000. Pl.'s App. at 97 (Letter from Botting to Dick Pacific (May 8, 2003)). Dick Pacific then forwarded to the U.S. Army Corps of Engineers the notice of wage escalation along with the pertinent underlying information. Pl.'s App. at 96 (Letter from Dick Pacific to Ken Larson, Project Engineer (May 8, 2003)). Dick Pacific informed Mr. Larson that it was submitting the information "in reference to the [e]conomic [p]rice [a]djustment contained in FAR Contract Provision 52.216-4." *Id.* Subsequently, Claudette McDonald, the project's contracting officer, informed Dick Pacific that after a careful review of Botting's bid estimate, the government had determined that Botting's bid appeared to contain clauses which incorporated escalating labor costs. Def.'s App. at 90-91 (Letter from Claudette M. McDonald, Contracting Officer, to Dick Pacific (Aug. 19, 2004)).[4] Botting explained that the portions of its bid which the government construed to be impermissible labor-cost escalations were actually "used to include an additional estimated labor cost that was over and above the raw labor estimates for the individual work items. The additional amount was for hiring specialized personnel from outside the local area since there were not enough local workers, especially supervisors, to fill all positions." Def.'s App. at 97 (Mem. for Record (Nov. 4, 2004)).

On October 26, 2004, Ms. McDonald told Dick Pacific that it was denying Botting's request for an economic price adjustment. Def.'s App. at 95 (Letter from McDonald to Dick Pacific (Oct. 26, 2004)). Ms. McDonald explained that the government was rejecting Botting's request because "Botting included labor escalation in their bid" and that the company's arguments to the contrary were "not supported by the contemporaneous documentation." *Id.* In response to the government letter's rejecting Botting's claim for a price adjustment, Dick Pacific and Botting filed a certified claim requesting a contracting officer's decision on whether Botting was eligible to receive a price adjustment. Def.'s App. at 103 (Certified Claim Letter by Dick Pacific to Government (Dec. 29, 2004)). The contracting officer issued a decision on March 11, 2005, denying the price adjustment. Pl.'s App. at 112 (Contracting Officer's Decision (Mar. 11, 2005)). The contracting officer rejected the claim on the ground that "Botting's bid estimate, and therefore [Dick Pacific's] base price for mechanical work, appear to include a contingency for labor on all of Botting's laborer or mechanic hours. Since FAR 16.203-2(a) prohibits the

---

[4]Dick Pacific maintains that Botting's bid did not contain an escalation for labor costs. *See* Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Facts at 9.

duplication of contingency, the contractor is not entitled to an EPA adjustment on the baseline direct labor hours included in Botting's bid." *Id.*

On April 11, 2005, Dick Pacific contested the contracting officer's ruling by filing a complaint in the Court of Federal Claims. Def.'s App. at 131 (Complaint, *Dick Pacific v. United States*, No. 05-462C (Fed. Cl. Apr. 11, 2005)). Upon completion of discovery, the parties submitted cross-motions for summary judgment. Compl. ¶ 14. While the cross-motions for summary judgment were pending, the parties negotiated and entered a settlement agreement "[f]or the purpose of disposing of plaintiff's claim that it is entitled to a determination of the amount owing for wage escalation under its contract with the [g]overnment under its [e]conomic [p]rice [a]djustment [c]lause." Pl.'s App. at 115 (Settlement Agreement (Apr. 16, 2007)). In substance, the settlement agreement provided

> that Botting is barred from recovering the amount of $315,151 included in its sub-bid allegedly for wage escalation, and releasing, waiving, and abandoning any and all claims to recover this amount as part of its EPA claim for wage escalation; in exchange, the [g]overnment will proceed with a verification audit of the remainder of Botting's Economic Price Adjustment wage escalation claim, and agree[s] that the alleged inclusion of such costs in . . . Botting's sub-bid does not bar Botting [from] any additional EPA wage escalation costs with applicable interest due, over the alleged included wage escalation costs ($315,151).

*Id*. at 117 (Settlement Agreement).

Roughly two months later, on June 13, 2007, Dick Pacific provided the government with documentary support for Botting's request for a price adjustment. Pl.'s App. at 122 (Letter from Botting to Dick Pacific (June 13, 2007)). Botting submitted a total wage escalation claim of $759,596.39, in effect seeking to recover $444,445.39 because of the $315,151.00 adjustment specified in the settlement agreement. Pl.'s App. at 124 (Botting's Economic Price Adjustment Summary). Dick Pacific and Botting did not recertify this reduced claim. The DCAA completed its audit on April 2, 2008, and called into question $494,288 of Botting's claimed costs. Pl.'s App. at 132 (DCAA Audit Report No. 4261-2007A17200001 (Apr. 2, 2008)). Most of DCAA's disapprovals stemmed from its comparative use of Davis-Bacon labor rates rather than the actual union labor rates paid by Botting. *See, e.g.*, *id.* at 158; Def.'s Proposed Findings of Uncontroverted Fact at 7-8. After reviewing the DCAA's audit report and Dick Pacific's objections, the contracting officer issued a new decision on May 22, 2008, concluding that Botting was not entitled to a price adjustment because the unchallenged amount of $265,307 "is still less than the escalation of $315,151 that was included in Botting's bid, and already paid by the [g]overnment." Pl.'s App. at 203 (Contracting Officer's Decision (May 22, 2008)).

Dick Pacific again sought relief in this court from the contracting officer's decision by filing a complaint on June 6, 2008. After an amended complaint was filed and the government

submitted its answer, the parties tendered the competing cross-motions and a hearing was held on April 17, 2009.

## STANDARDS FOR DECISION

Before this court can reach the merits of a case, its jurisdiction over the matter in controversy must be established. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). As plaintiff, Dick Pacific bears the burden of establishing by a preponderance of the evidence that this court has subject matter jurisdiction over its claims. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *see also McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936). In ascertaining whether subject matter jurisdiction over a dispute exists, this court must accept as true all facts asserted in plaintiff's complaint and "draw all reasonable inferences" in favor of the plaintiff. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The factual allegations contained in plaintiff's complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see also Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

Summary judgment is appropriate when the evidence demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC"); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The moving party has the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A "genuine" dispute exists if the issue "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A material fact is one which "might affect the outcome of the suit under the governing law." *Id.* at 248. Mere denials, conclusory statements, or evidence that is not significantly probative will not suffice to preclude summary judgment. *Id.* at 249-52; *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). In considering the existence of a genuine issue of material fact, a court must draw all inferences "'in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary may be granted. *Id.*

With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered. *Mingus Constructors,* 812 F.2d at 1390-91. To the extent there is a genuine issue of material fact, both motions must be denied. *Id.*

ANALYSIS

A.  *Jurisdiction*

Among other things, the Tucker Act grants this court juridical power "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, . . . on which a decision of the contracting officer has been issued under section 6 of that Act."  28 U.S.C. § 1491(a)(2).  The Contract Disputes Act provides that "[f]or claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor."  41 U.S.C. § 605(c)(1).  "The certification . . . may be executed by any person duly authorized to bind the contractor with respect to the claim."  41 U.S.C. § 605(c)(7).  The Contract Disputes Act required certification to forestall the submission of fraudulent claims.  *See Ingalls Shipbuilding, Inc. v. O'Keefe*, 986 F.2d 486, 491-93 (Fed. Cir. 1993) (reviewing the legislative history of the certification requirement and concluding that "Congress clearly intended that the certifier also bind the company under civil fraud statutes").

In support of its motion to dismiss, the government cites decisions from the Federal Circuit that it interprets as establishing that "a properly certified claim . . . is a jurisdictional prerequisite to maintaining a suit under the C[ontract] D[isputes] A[ct]."  Def.'s Cross-Mot. at 11 (citing *United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 579 (Fed. Cir. 1991); *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1384 (Fed. Cir. 1983)).  The government contends that Dick Pacific's failure to certify, *i.e.*, recertify, its renewed price-adjustment claim to the contracting officer deprives this court of jurisdiction over that claim.  Def.'s Cross-Mot. at 11.  Dick Pacific responds that it was not required to certify its 2007 price-adjustment claim because it had previously certified the claim in 2004.  Pl.'s Resp. at 8.  Dick Pacific contends that the certification of its original claim in December 2004 suffices to embrace the renewed claim because the only change was a reduction in the amount of money that it sought to recover because of the settlement agreement.  *See id*. at 9-10.  The government agrees that a prior certification may be sufficient under the Contract Disputes Act; however, it asserts that "Dick Pacific has presented no factual evidence that its later amendment of its claim does indeed relate back to the original certification."  Def.'s Reply at 3.

In addressing whether Dick Pacific was required to certify its renewed claim in June 2007, the parties dispute the applicability of the Federal Circuit's decisions in *Glenn v. United States*, 858 F.2d 1577 (Fed. Cir. 1988), and *Tecom, Inc. v. United States*, 732 F.2d 935 (Fed. Cir. 1984).  *Compare* Pl.'s Resp. at 8, *with* Def.'s Reply at 4-5.  In both *Glenn* and *Tecom*, certification of a claim was not initially required because the plaintiff had sought to recover an amount that was under the threshold triggering certification in the Contract Disputes Act.  *Glenn*, 858 F.2d at 1578; *Tecom*, 732 F.2d at 937.  In each case, the government pointed to developments subsequent to the contracting officer's decision that increased the amount plaintiff

sought to recover above the threshold requiring certification, and it argued that consequently the contractor had to have certified the increased claim to the contracting officer.  *See Glenn*, 858 F.2d at 1580; *Tecom*, 732 F.2d at 937.  In each instance, the Federal Circuit rejected that position and instead held that when a contractor submits a claim to the contracting officer that does not require certification but subsequent developments cause an increase in the recovery sought on the same claim to an amount that is above the certification threshold, the court will not require the claim to be certified.  *See, e.g.*, *Glenn*, 858 F.2d at 1580 ("Because Glenn was not required to certify his $31,500 claim before the [Contracting Officer], he need not have certified the $66,570.32 resulting from the denial of his initial claim."); *Tecom*, 732 F.2d at 938 (stating "the general principle that a *monetary claim properly considered* by the contracting officer (here, because it was less than $50,000 and covered only one year) *need not be certified or recertified if that very same claim* (but in an increased amount reasonably based on further information) *comes before a* board of contract appeals or a *court*." (emphasis added except that for "properly")).[5]  The basis of the Federal Circuit's ruling in *Tecom* and *Glenn* was that the certification requirement of the Contract Dispute Act "applies to submission of claims to the contracting officer; certification at that time, if required, is all-important."  *Tecom*, 732 F.2d at 937.

     The government asserts that *Glenn* and *Tecom* are not applicable to the present circumstances because those two "cases involve changes in the amount of a claim as a result of the [g]overnment's action that [a]ffects the claim before the applicable board of contract appeals or the [c]ourt," while in the instant case the "change[d] . . . claim presented to the contracting officer . . . [was] a result of the contractor's own initiative."  Def.'s Reply at 3-4.  However, the government's proffered basis for distinguishing *Glenn* and *Tecom* is misplaced.  The critical question is whether the same claim was put at issue in the subsequent proceedings before the contracting officer.  *See Miya Bros. Constr. Co. v. United States*, 12 Cl. Ct. 142, 146 (1987) (holding that "the exact amount of a claim is considered irrelevant to the general principle that a monetary claim has been properly excepted [through a certified submission to the contracting officer] . . . .  The factual basis for the claims are identical to the claims that were filed on August 28, 1981, after being certified to the contracting officer."); *see also Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed. Cir. 1987) (stating that "[o]n appeal to the Board or in a direct access action in the [Court of Federal Claims], a contractor may increase the amount of his claim, but may not raise any new claims not presented and certified to the contracting officer").  Correlatively, the contractor may reduce the amount of the claim without recertification, so long as the same claim is at issue.  In this vein, other judges of this court have ruled that the court has jurisdiction over an action brought under the Contract Disputes Act where revised monetary relief was sought before the contracting officer, absent recertification, so long as the change in the amount sought "'is based on the same set of operative facts previously presented to the contracting officer;' and 'the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying a[]

---

[5]Both *Glenn* and *Tecom* reflect the circumstance that the threshold for certifying claims was at the time $50,000, not $100,000 as it is today.  *See* 41 U.S.C. § 605 (note regarding amendments in 1994, when the threshold was raised).

[change] in the amount of the claim.'" *AAI Corp. v. United States*, 22 Cl. Ct. 541, 544 (1991) (quoting *Kunz Constr. Co. v. United States*, 12 Cl. Ct. 74, 79 (1987)); *see also North Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 186 (2007) (commenting on the "so-called 'enlarged claim' doctrine" and quoting *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 701 (1994), for the proposition that recertification is not required for "'new matters inherent in the claims previously presented'").

Here, Dick Pacific's price-adjustment claim presented to the contracting officer in 2007 was premised upon the same set of operative facts as those that were the basis of its certified claim submitted in 2004. Both the original and renewed claims center on whether Botting is entitled to an adjustment under the economic-price-adjustment clause of the contract for the increased labor costs it experienced while working as a subcontractor for Dick Pacific. The only difference consists of a reduction in the amount sought to $759,596.39 rather than $1,492,106.05. That difference is entirely attributable to the settlement agreement it entered in 2007 and the resulting examination by the DCAA. Those factors did not change the underlying premises for the claim but rather put a limitation on it. Additionally, the renewed claim was adjudicated by the contracting officer, who took into account the grounds for his original decision as supplemented only by the provisions of the settlement agreement and the results of the new DCAA audit. Thus, the renewed claim arose from the same set of operative facts as the original claim, and recertification of the renewed claim was not required. The government's jurisdictional challenge therefore is unavailing and the court will proceed to examine the cross-motions for summary judgment.

*B. Settlement Agreement*

The government contends that it is entitled to summary judgment on Dick Pacific's claim based upon the 2007 settlement agreement, asserting that Dick Pacific is unable to produce any evidence that the settlement agreement was breached. Def.'s Cross-Mot. at 12. The relevant portion of the settlement agreement provided that

> the [g]overnment will proceed with a verification audit of the remainder of Botting's [e]conomic [p]rice [a]djustment wage escalation claim, and agree[s] that the alleged inclusion of such costs in [] Botting's sub-bid does not bar Botting [from] any additional EPA wage escalation costs with applicable interest due, over the alleged included wage escalation costs ($315,151).

Pl.'s App. at 117 (Settlement Agreement). Dick Pacific asserts that the government's failure to pay Botting's price-adjustment claim in its entirety upon the completion of the DCAA audit constituted a breach of the settlement agreement. *See* Hr'g Tr. 46:3-5 (Apr. 17, 2009). The government responds that Dick Pacific's argument is misplaced because the settlement agreement merely required it to perform an audit and did not commit the government to paying any portion of Botting's price-adjustment claim. Def.'s Cross-Mot. at 13-14. Recognizing that the settlement agreement does not explicitly require the government to pay Botting's wage-

10

escalation claim, Dick Pacific argues that if the "audit shows an amount is due under the EPA clause then the main contract calls for payment." Hr'g Tr. 47:2-5.

Dick Pacific's attempt to rely on the construction contract to support its claim that the government had an independent obligation to pay Botting's wage-adjustment claim under the settlement agreement is misplaced. The settlement agreement contained a merger clause providing that it "constitute[d] a complete integration of the agreement between the parties and supercedes any and all prior oral or written representations, understandings[,] or agreements among or between them." Pl.'s App. at 119 (Settlement Agreement). Thus, any obligation to make a payment under the settlement agreement would have to arise independently from the terms of the settlement agreement and not rest on any implicit incorporation of a duty arising under the construction contract.

Moreover, the 2007 settlement agreement does not provide any basis for relief independent from the construction contract itself. The express language of the settlement agreement did not commit the government to reimbursing Botting for any portion of its wage-escalation claim. *See* Pl.'s App. at 117 (Settlement Agreement). The only affirmative action the settlement agreement required the government to undertake was an audit of Botting's claim. *Id.* Here, neither party disputes that the government conducted an audit of Botting's price-adjustment claim. Compl. ¶ 19; *see* Pl.'s App. at 128 (DCAA Audit Report). Thus, the government complied with its obligation under the settlement agreement when the DCAA conducted an audit of Botting's price-adjustment claim.

Alternatively, Dick Pacific argues that there is an ambiguity in the settlement agreement and thus it should be reformed to reflect the mutual intent of the parties. Pl.'s Resp. at 16. The Federal Circuit has identified four factors that a party seeking reformation needs to satisfy: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation." *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990). The party seeking reformation must establish each of the four elements by "clear and convincing evidence" because "reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy." *National Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006).

Dick Pacific's claim for reformation of the settlement agreement is unavailing. Here, Dick Pacific has not come forward with any evidence indicating that the settlement agreement did not accurately reflect the parties' intent. The ambiguity upon which Dick Pacific relies in seeking reformation stems from the interaction of the economic-price-adjustment clause in the construction contract with the reference in accompanying schedule to Davis-Bacon labor rates, exacerbated by the further mention in Amendment 0001 of Davis-Bacon labor rates, union rates, or other actual labor rates listed for each employee. *See* Pl's. Resp. at 19. There is no ambiguity in the settlement agreement taken alone. Furthermore, the failure of the government to pay Botting's wage-escalation claim upon completion of the DCAA audit, cannot serve as grounds

for a reformation of the contract.  At the hearing, Dick Pacific conceded that after the completion of the DCAA audit, it "hope[d] that payment would [have been] forthcoming [from the government]."  Hr'g Tr. 47:24 to 48:2.  The failure of this hope to materialize cannot serve as a ground for reformation because "'[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a "mistake" as that word is defined [under the doctrine of mutual mistake of fact].'"  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1203 (Fed. Cir. 1994) (quoting *Restatement (Second) of Contracts* § 151 cmt. a (1981)).

In short, the settlement agreement only required the government to conduct an audit of Dick Pacific and Botting's wage-escalation claim, which it did, and it provides no independent obligation requiring the government to pay any portion of that claim.  Thus, the government is entitled to summary judgment on the issue of whether it breached the 2007 settlement agreement.

*C. Economic-Price-Adjustment Clause*

The parties' principal dispute centers on whether the economic-price-adjustment clause in the construction contract limits Botting's wage-escalation claim to increases reflected in Davis-Bacon labor rates or allows it to recover the increased union rates it paid its employees.  The FAR explains that "[a] fixed-priced contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies."  FAR § 16.203-1(a).  The FAR then proceeds to identify three types of economic-price-adjustment clauses.  FAR § 16.203-1(a).  Economic-price-adjustment clauses can be based upon either established prices, actual costs of labor or material, or cost indexes of labor or material.  FAR § 16.203-1(a)(1)-(3).

The economic-price-adjustment clause that was inserted in the construction contract was keyed to actual cost.  Pl.'s App. at 13-14 (Contract Section 52.216-4); FAR § 16.203-4(c) (stating that if a contracting officer wishes to utilize an economic-price-adjustment clause based upon actual cost he or she should "insert a clause that is substantially the same as the clause at [FAR] 52.216-4").  The FAR explains that an actual-cost economic-price-adjustment clause is "based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance."  FAR § 16.203-1(a)(2).  One of the limitations on the ability of a contractor to invoke the economic-price-adjustment clause in the instant case was that the clause by its own terms limited "[a]ny adjustment . . . to the effect on unit prices of the increases or decreases in the rates of pay for labor (including fringe benefits) in the Schedule."  Pl.'s App. at 13 (Contract Section 52.216-4(c)(1)).

The dispute over the clause stems from the language of the clause as contrasted to that of the schedule.  The FAR provides that if an actual-cost economic-price-adjustment clause is used, "[t]he contracting officer shall describe in detail in the contract Schedule – (i) The types of labor and materials subject to adjustment under the clause; [and] (ii) The labor rates, including fringe benefits (if any) and unit prices of materials that may be increased or decreased."  FAR § 16.203-4(c)(3)(i)-(ii).  Here, the schedule provided that the construction of the replacement hospital and

the accompanying site work were "subject to clause 52.216-4, Economic Price Adjustment-Labor and Materials. Established labor rates and fringes as set forth for laborers and mechanics in Davis-Bacon General Decision Number AK010001 and AK010006, dated 10/19/01 in section 0700A are subject to [a]djustment." Pl.'s App. at 19 (Contract Schedule). The mention of Davis-Bacon rates in the schedule would comport with use of an indexed-cost provision in the contract but is at odds with the use of an actual-cost economic-price-adjustment clause. Additionally, Amendment 0001 to the solicitation adds further confusion by providing that a prospective contractor should be prepared to furnish either Davis-Bacon labor rates, union rates, or the rates of its current employees such that DCAA could establish the "baseline quantity of labor for future economic price adjustments." Pl.'s App. at 29 (Amendment 0001, Excerpts).

The government contends that the economic-price-adjustment clause and contract schedule should be read in concert to establish that Dick Pacific and Botting are entitled only to adjustments based on increases in the Davis-Bacon labor rates. Def.'s Mot. at 18-19. The government's claim is based upon the fact that "[t]he [s]chedule . . . specifically identifies the Davis-Bacon labor rates and fringes for laborers and mechanics as being the rates that are subject to adjustment pursuant to the EPA clause." Def.'s Mot. at 18. Additionally, the government contends that its desire to pay adjustments based only on Davis-Bacon labor rates was known by all potential contractors and subcontractors on the hospital replacement project and thus Dick Pacific and Botting are bound by the government's interpretation of the provision. Def.'s Mot. at 19-20.

Dick Pacific contends that the economic-price-adjustment clause contained in the construction contract requires the government to pay the increase in union labor rates that Botting was required to pay those individuals that worked on the Bassett Hospital construction. Pl.'s Am. Mot. at 26. In support, Dick Pacific relies on the government's decision to use the FAR's actual-cost economic-price-adjustment clause and the reference to union rates in Amendment 0001 to the solicitation. Pl.'s Resp. at 19, 21. Dick Pacific asserts that the government's reliance on the schedule is misplaced because the applicable section "merely identifies the type or class of laborers whose direct labor costs are eligible for adjustment." Pl.'s Resp. at 21. Additionally, Dick Pacific contends that the government's interpretation of the economic-price-adjustment clause is erroneous because "it ignores the fact that the [g]overnment inserted another provision [Amendment 0001] that further defines what 'direct labor rates' are for purposes of escalation and clarifies what cost components are to be adjusted and what information is [to] be used to establish the baseline." Pl.'s Am. Mot. at 18.

In interpreting a contract a court begins with the language of the agreement. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000); *Record Steel & Constr., Inc. v. United States*, 62 Fed. Cl. 508, 513 (2004). If the terms of the contract are unambiguous, the court must give effect to the plain meaning and may not look to extrinsic evidence as an interpretative guide. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004). In interpreting a contract, the court is to read the contract as a whole and endeavor to give a reasonable meaning to all its provisions. *Jowett*, 234 F.3d at 1368 (citations omitted).

Both Dick Pacific and the government have contended that the contract is not ambiguous and that their preferred reading is the only one which can be supported by the text of the agreement. Despite maintaining that the contract is unambiguous, both parties in their brief recognize that an ambiguity does exist. The government undermines its own argument that the economic-price-adjustment clause is unambiguous when it concedes that the contract and contract schedule create an economic-price-adjustment clause which "contain[s] both elements of an actual cost EPA and an indexed EPA. It uses the Davis Bacon rates to track actual cost, but also limits its application to those costs actually experienced." Def.'s Mot. at 26. Similarly, Dick Pacific recognizes that the contract schedule "create[s] an ambiguity as to: (a) how the labor cost baseline will be established; (b) what labor costs will be considered for price adjustment; and (c) whether Davis-Bacon will act as a limitation on actual cost increases." Pl.'s Am. Mot. at 19.

The construction contract between Dick Pacific and the government provides that in resolving any inconsistencies that may arise during the solicitation and performance of the agreement, the contract schedule was to be given precedence over any representation, instructions, contract clauses, other documents, exhibits, attachments, or specifications. Def.'s App. at 56 (Excerpt from Contract DACA85-02-C0004 (Order of Precedence)). A problem arises because the relevant provision of the schedule introduces the previously mentioned ambiguity into the economic-price-adjustment clause. Thus, the order-of-precedence clause of the contract is of little help in resolving the parties' differing interpretations of the economic-price-adjustment clause. *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) (holding that an order-of-precedence clause did not resolve an ambiguity where there was "substantial doubt as to which of the inconsistent directions of the specifications should govern").

The Federal Circuit has explained that "[t]o show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citations omitted). Both the government's and Dick Pacific's interpretations draw upon aspects of the contractual language, each emphasizing particular terms and discounting others. Both interpretations are unsatisfying, and to that extent, each is as reasonable as the other.

Issues of contract interpretation often are appropriate for resolution through summary judgment because contract interpretation is a matter of law. *See, e.g.*, *NVT Techs.*, 370 F.3d at 1159; *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998). In certain instances, however, the proper interpretation of a contract may engender questions of fact. *See Burchick Constr. Co., Inc. v. United States*, 83 Fed. Cl. 12, 20 (2008). When an issue of contract interpretation raises a genuine issue of material fact, summary judgment is inappropriate. *See Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (vacating a grant of summary judgment on an issue of contract interpretation when the parties needed to produce extrinsic evidence and that evidence needed to be weighed by the trier of fact to resolve a

14

contract ambiguity); *Burchick Const. Co.*, 83 Fed. Cl. at 20 (denying cross-motions for summary judgment that involved ambiguous contractual provisions because the evidence presented was insufficient to determine the parties' intentions and resolve ambiguities).

In the instant case, the ambiguity in the economic-price-adjustment clause is not amenable to resolution through summary judgment. In their cross-motions, both parties presented some extrinsic evidence to support their arguments. However, the extrinsic evidence presented by the parties is sharply contradictory regarding the parties' intention concerning whether the economic-price-adjustment clause would turn on actual labor costs, an index of such costs, or a combination of the two. *Compare* Def.'s App. at 75 (Slides from Pre-Proposal Conference (Oct. 13, 2001)), *with* Pl.'s App. at 29 (Amendment 0001, Excerpts). To properly resolve the ambiguity from the evidence currently presented in this case, the court would be required to "draw inferences at the 51 percent level." Hr'g Tr. 64:23-25. However, in deciding a motion for summary judgment, the court may not weigh the evidence in an area of disputed fact. *See, e.g.*, Anderson, 477 U.S. at 249; *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998) (stating that "courts do not make findings of fact on summary judgment").

At the hearing, Dick Pacific maintained the court could resolve the issue of the ambiguity in the economic-price-adjustment clause by relying on the rule of *contra proferentem* because the government drafted all of the relevant contractual provisions. *See* Hr'g Tr. 44:3-6. The rule of *contra proferentem* provides that ambiguities will be construed against the drafter. *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004). Nonetheless, Dick Pacific's reliance on the doctrine is misplaced. The doctrine of *contra proferentem* is a "rule of last resort," "applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (citations omitted)). Consequently, invocation of the doctrine of *contra proferentem* is premature at this stage. *See HPI/GSA-3C*, 364 F.3d at 1334. A trial of the facts must be held to resolve the disputed issues associated with the ambiguity of the economic-price-adjustment provisions of the construction contract.

**CONCLUSION**

For the reasons stated, the government's motion to dismiss is DENIED. The government's motion for summary judgment is GRANTED insofar as Dick Pacific's claim resting on the 2007 settlement agreement is concerned. The government's motion for summary judgment is otherwise DENIED, as is Dick Pacific's motion for partial summary judgment.

Preparatory steps for a trial shall be undertaken. In accord with RCFC Appendix A, ¶¶ 11 and 12, the parties are directed to confer and to file a joint status report by June 10, 2009, addressing the items listed in ¶ 12 (last sentence) with respect to trial.

It is so ORDERED.

                                                <u>s/ Charles F. Lettow</u>
                                                Charles F. Lettow
                                                Judge